# UNITED STATES DISTRICT COURT
## for the
### Middle District of Tennessee

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. 24-mj-1036 |
| PAUL FAYE, SR. | ) | |
| | ) | |
| | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __January 11, 2024__ in the county of __Montgomery__ in the
__Middle__ District of __Tennessee__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 26 U.S.C. § 5861(d) | Possession of an unregistered firearm/silencer regulated by the National Firearms Act |

This criminal complaint is based on these facts:

Please see the attached statement in support of criminal complaint.

☑ Continued on the attached sheet.

_/s/ Angelo DeFeo_
*Complainant's signature*

FBI SA Angelo DeFeo
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
__telephone__ (specify reliable electronic means).

Date: __February 2, 2024__

City and state: __NASHVILLE, TN__

Barbara D. Holmes, United States Magistrate Judge
*Printed name and title*

**STATEMENT IN SUPPORT OF A CRIMINAL COMPLAINT**

1.     Your affiant, Angelo DeFeo, is a Special Agent assigned to Memphis Field Office-Nashville Resident Agency. In my duties as a special agent, I investigate domestic terrorism violations and other threats of violent crime. As a Special Agent, I am authorized by law or by a government agency to engage in or supervise the prevention, detention, investigation, or prosecution of violations of Federal criminal laws.

2.     I make this statement in support of a criminal complaint charging Paul FAYE Sr. ("FAYE") with possessing, selling, or transferring a firearm not registered on the Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF") National Firearm Registration and Transfer Record (NFRTR), in violation of Title 26, United States Code, Sections 5841, 5861, and 5871. Based on the facts outlined below, your affiant submits there is probable cause to believe that FAYE committed this offense.

3.     The facts of this affidavit come from my personal observations, my training and experience, and information obtained from other Agents and witnesses. Except where indicated, all statements referenced herein are set forth in substance and in part, rather than verbatim. This affidavit is intended to show only that there is sufficient probable cause to charge FAYE with the aforementioned crimes.

**PROBABLE CAUSE**

*Investigative Background*

4.     Bryan PERRY ("PERRY") is an individual charged in Case Number 2:22-cr-04065, pending in the Western District of Missouri with various violent federal felonies. Based upon a review of PERRY's cell phone seized during that investigation, PERRY had extensive contact with FAYE leading up to PERRY's arrest in Missouri. Specifically, FAYE expressed a

1

desire to travel with PERRY and another individual to the U.S./Mexico border and commit acts of violence.

***Continued Investigation of FAYE***

5.        In March 2023, the FBI introduced Undercover Employee (UCE1) to FAYE via TikTok. After exchanging direct messages via TikTok, FAYE provided UCE1 with his phone number for further communication. The phone number provided, and used for all subsequent recorded phone calls described below, was a Samsung cellphone using number (931) 216-6384. On or about April 1, 2023, UCE1 and two other Undercover Employees (UCE2 and UCE3) met with FAYE, in person, along with FAYE's two sons. During the meeting, FAYE inquired if the UCEs were federal law enforcement. After confirming the UCEs were not law enforcement, FAYE discussed his belief that the government was training to take on its citizens, and more specifically, that the federal government was allowing illegal immigrants to enter the United States to help the government. FAYE went on to discuss his tactical training and weapons he had in his possession. During this interaction, which was audio recorded, UCE2 observed a photograph on FAYE's phone which showed a 6.5 Creedmoor rifle with what appeared to be a suppressor affixed to the end.

6.         Prior to this incident, the FBI conducted a check of the National Firearm Registration and Transfer Record ("NFRTR") for Paul FAYE Sr. on or about December 20, 2022. FAYE had not registered a suppressor with the NFRTR as required at that time.

7.        On or about May 11, 2023, UCE1 conducted a recorded phone call in which FAYE discussed the need to train with the UCEs in person prior to traveling to the international border between the United States and Mexico. Specifically, FAYE stated, "the patriots are going to rise up because we are being invaded. We are being invaded." "As far as gear, I mean, I probably got enough extra to get you by, if need be, and then we can pick you some up as we go. Hell, there may be some laying around, you know, after a little while." This statement, based on my training

2

and experience, indicated that FAYE believed there would be deceased individuals from whom the UCE1 could recover equipment.

8.      During a recorded phone call in which UCE1 called FAYE on or about May 12, 2023, FAYE discussed the need for UCE1 to obtain a ballistic plate carrier and stated, "if you can't find them, I'm pretty sure there's going to be some laying around after a while, ya follow me?" This statement, based on my training and experience, indicated that FAYE believed there would be deceased individuals from whom UCE1 could recover a ballistic plate carrier. Similar previous statements were made by PERRY to UCE1 in which he stated equipment such as night vision goggles could be obtained from deceased Border Patrol agents. Additionally, when UCE1 asked what was needed at the international border between the United States and Mexico, FAYE stated, "the main thing is tactical gear. You need gas masks and stuff, they are going to put gas out, I can guarantee that."

9.      During the same conversation on or about May 12, 2023, UCE1 inquired about law enforcement presence at the border, to which FAYE responded, "[t]here are ways to deter that and that's where I come in. That's the training I'm going to give you all."

10.     On or about August 31, 2023, UCE1 conducted a recorded phone call with FAYE. During the phone call, FAYE stated he was gathering up a few things that go "boom boom boom when you want them to," that it was time to "step things up," and "I have a few things that go bang and go fast if you know what I mean." Based on my training and experience, I understand this statement to mean FAYE was referring to explosives and/or guns and ammunition. FAYE advised UCE1 they needed to get together in person as soon as possible.

11.     During a recorded phone call with UCE1 on or about November 27, 2023, FAYE indicated he met Person 1. According to FAYE, Person 1 was from North Carolina and had

3

previously traveled to the United States border with Mexico (specifically the Eagle Pass, Texas area) with members of his militia group, NC Patriot Party, and planned to travel back to the border on or about January 20, 2024. During the call, UCE1 asked, "Are we gonna go to work? Are we going down there to put eyes on or are we going down there to do work?" to which FAYE responded, "No no, we're gonna work, we're gonna work. I'll get more detail with you. Before then, we will get together in person. I'll take a ride over there to see you, or whatever." Based on my training, experience, and knowledge of the investigation, when UCE1 discussed "doing work" versus "putting eyes on" UCE1 was asking FAYE if they were planning to travel to the border for the purpose of conducting acts of violence, or to conduct surveillance. FAYE's response of "we're gonna work," I believe, indicates FAYE is stating he is planning to conduct acts of violence.

12.     On or about December 14, 2023, UCE1 conducted an in-person meeting with FAYE. UCE1 later relayed the substance of that meeting to law enforcement. During the meeting, FAYE discussed coordinating with militia groups from Kentucky, Georgia, North Carolina, and Tennessee. FAYE discussed plans for traveling to the border and how he planned to transport explosive devices to the border without law enforcement detection. FAYE advised UCE1 that he needed to meet with an individual he referred to as "Alpha" and stated:

> I'll tell you this right now, the guy, Alpha, I gotta go see him. I'm probably going to try and go see him this week, weekend. He can make it. Like I said, he can put stuff together. He can go under kitchen sink and come out with napalm.

13.      FAYE explained to UCE1 that his hope is "to stir up the hornet's nest" at the border so that others will come in to provide further support. Specifically, FAYE stated, "Well, I'm going to tell you something right now. What's going to happen. What I hope happens. Is called a domino effect. I want, I want the news to find out about it. The right kind of news." FAYE also discussed how to seal compartments in vehicles they will be traveling in so that law enforcement would need

4

a search warrant to access them. Specifically, while standing by FAYE's vehicle, FAYE stated, "I'm going to put a bedcover on the back of it. Something that I can slide stuff in. Cause see, let me tell you something. You should start thinking like this. You got something laying in the back of the truck, cop pulls you over he can look in, he knows right then, but if you got it locked in, sealed in, he cannot open it without a search warrant, but if he sees it in the back of your truck…"

14.     FAYE reported that one of his roles within the group travelling to the border was to serve as a sniper and that his talent was "sending rounds down range." Based on my training and experience and this investigation, I believe the phrase "sending rounds down range" means that FAYE's specialty (or contribution to the mission) will be shooting at other individuals while at the border. During the conversation about FAYE's role as a sniper, FAYE stated:

> I'll be the first one on the scene, and the last one to leave. The reason why I say that is, if something, just say that we were going down like that, before you even put yourself in danger, I would be on top that roof right there, zeroing out, taking out anybody. And then as y'all coming out, I'm going to be taking out . . .

15.     Additionally, during the in-person meeting with UCE1 on or about December 14, 2023, FAYE indicated he was in possession of Tannerite[1], which he stated could easily be converted into Claymore mines.[2] FAYE advised UCE1 that he stationed butane tanks around his property so in the event law enforcement arrived, he could use the tanks as boobytrap explosive devices. During the same conversation, FAYE mentioned that he had a guy in Cookeville (Tennessee) who could make improvised explosive devices.

---

[1] Tannerite is commonly defined as is a brand of binary explosive targets used for firearms practice and sold in kit form. The targets comprise a combination of oxidizers and a fuel, primarily aluminum powder, that is supplied as two separate components that are mixed by the user.

[2] Claymore mines are commonly defined as an electrically fired land mine containing steel fragments that are discharged in a predetermined direction to injure, maim, or kill an approaching adversary. The military often uses claymore mines when attempting to ambush enemy forces.

5

16.     Law enforcement conducted a check of the National Firearm Registration and Transfer Record ("NFRTR") for Paul FAYE Sr. on or about January 8, 2024. FAYE had not registered any firearm controlled by the National Firearms Act with the NFRTR as required.

17.     During this same conversation, the UCE1 asked about a suppressor for an AK47, and FAYE stated he would provide one to UCE1 and that it did not have a "tax stamp" on it. Based on my training and experience, the reference to a suppressor without a "tax stamp" refers to the possession of a suppressor that violates the National Firearms Act, Title 26, United States Code, Section 5861, et seq. Based on my training and experience, FAYE disclosed to UCE1 that the suppressor he was going to provide UCE1 did not have a tax stamp because FAYE was alluding to the fact that the suppressor would not be known to the government or registered in the National Firearms Registration and Transfer Record.

18.     On or about January 11, 2024, UCE1 and UCE2 conducted an in-person meeting with Paul FAYE at his residence, which is located at 4262 Budds Creek Road, in Cunningham, Tennessee. After entering FAYE's residence, FAYE showed the UCEs his "war room" which consisted of numerous firearms, a large amount of ammunition, radios, and a bullet proof vest. FAYE invited the UCEs to hold numerous firearms to include a Creedmoor rifle, multiple AR-15 rifles, and a shotgun. Additionally, while inside FAYE's trailer, UCEs observed numerous other firearms.

19.     During this meeting, FAYE discussed the plan to travel to the U.S./Mexico border and indicated the desire to commit acts of violence. Later in the meeting, UCE1 showed FAYE the AK-47 rifle they previously discussed. FAYE then produced the suppressor he had previously described to UCE1 and UCE1 purchased the suppressor from FAYE for $100.

6

20.     The suppressor provided by FAYE to UCE1 did not have any manufacturer markings or serial number which means that it cannot be registered in the NFRTR.

21.     On January 12, 2024, photograph(s) of the unmarked "silencer," also known as a suppressor, was sent to a Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms & Ammunition Technology Division (FATD), Firearms Enforcement Officer (FEO) for an initial preliminary review. The ATF FEO reviewed the photographs of the silencer and determined it to be consistent in size, shape, and configuration with all the other silencers he previously encountered as an FEO. The silencer in this case is a firearm as defined within the National Firearms Act (the "NFA") under Title 26, United States Code, Section, 5845(b) as it is a silencer. A silencer is defined as any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler. Furthermore, on January 12, 2024, an ATF Interstate Nexus expert physically inspected the silencer. The ATF Interstate Nexus expert determined the silencer did not have the markings as required under the NFA, such as a serial number, the location of manufacturer, or the firearm manufacturer.

22.     Based on the forgoing facts, your affiant submits there is probable cause to believe that Paul FAYE Sr. committed the offense of possessing, selling, or transferring a firearm not registered on the ATF's National Firearm Registration and Transfer Record (the "NFRTR"), in violation of Title 26, United States Code, Sections 5841, 5861, and 5871.